Case number 161782, John Levine v. Tower Automotive Operations. Case not, argument not to exceed 15 minutes per side. Mr. McCarthy, you may proceed for the appellant. May it please the Court, my name is Daniel McCarthy and I represent the plaintiff appellant, John Levaine.  The main thrust of our claim, Your Honor, is that we believe that summary judgment was improperly granted in this case, that the record revealed a number of fat questions, that if all of the facts in the record was construed in a light most favorable to Mr. Levine, summary judgment should have been denied and he should be permitted to have his day in court to explain why he believes that his FMLA rights were violated. We've briefed the notice issues. I believe that Mr. Levine submitted sufficient evidence to show unusual circumstances, that when he arrived one or two minutes late, he notified the only supervisor on duty, Mr. Whitridge, and Mr. Whitridge was Mr. Levine's supervisor, at least one of them anyway. Mr. Crider and Mr. Muther both testified that Mr. Paxton, Mr. Crider, and Mr. Whitridge were supervisors over Mr. Levine. And the law and the case law says that this is usually a factual issue and the threshold for Mr. Levine is very low in terms of establishing notice. And the district court, I believe, focused its entire analysis based on the fact that it believed that Mr. Levine gave insufficient notice and then from that determination determined that the remainder of his claims did not have legal merit. Well, I mean, if he was having the anxiety attack or if it began at home, which I believe was his testimony, why shouldn't the company be able to say he should have called in per the company's procedures rather than risk being late? Well, I anticipated that question, Judge Ketheridge, actually as I was sitting here. It's a good question. Mr. Levine was not asked about why he was one or two minutes late until about a year and four months after the July 29th, 2014 incident. In other words, he was asked that question for the very first time at his deposition. If the employer had questions regarding the sufficiency of his notice, the onus is on the employer to ask questions. I believe he testified when he was asked that question for the very first time almost a year and a half after. He was put on the spot and was trying to recollect as to what had happened. Also, the record doesn't show that even if he did call in, that somebody would have been there to answer the phone. One of the reasons why he went to Mr. Wetridge is because the normal protocol wasn't available yet. He was shifted to the very early morning shift. And so I don't believe that the record shows that even if he made that call or if he believed that he was going to be late before he got on his motorcycle, that that would have been practical, so to speak. So what exactly was the putative interference with his attempt to take FMLA leave? Well, on July 29th, he shows up. He tells the supervisor on duty that, I'm sorry, I'm one or two minutes late. It's due to my FMLA issues. He notes it on his time card. And the supervisor accepts Mr. Levain's explanation and he goes on to do his work. Approximately two days later, just two days later, his immediate supervisor, Mr. Crider, who we pointed out in the record had apparently an ax to grind with Mr. Levain, hands him a TARDI notice saying, we're issuing you a disciplinary notice for your two-minute late arrival two days earlier. And it's my position that that in and of itself is interference because it was, I think, under the shop, under the labor agreement, if he had just one or two more TARDI notices, he would have been terminated. Disciplining him after he invokes FMLA to the person he saw when he came in, that's the interference? Correct. Okay. No, go ahead. You know, it doesn't appear from the record that that resolution of matters was really final in any way. I mean, what happened was that the plant superintendent suggested that they go to Whitridges, who's the first supervisor he saw the day he came in, to try to resolve the matter. So, you know, if Mr. Levain is correct and, you know, this was an inconsistent resolution of it, there was a readily available means of getting it resolved and seeing if the TARDI was going to stand or not. But before they get to the plant superintendent's office, Mr. Levain blows up. That's what other witnesses . . . they didn't say he blew up, but . . . You know, what the record shows about the testimony about what your client did . . . I believe, Your Honor, the record shows, the way I read the testimony of the . . . And, by the way, Mr. Whitridge's deposition, for whatever reason, was not taken. But, the way I read the testimony from Mr. Levain and Mr. Kreider and Mr. Muther was that John . . . Mr. Levain explained to Mr. Kreider, no, I was excused. Mr. Whitridge . . . I reported it to Mr. Whitridge. They then went to Mr. Whitridge just to confirm that that's . . . I think they went to Mr. Whitridge just to confirm the truth of what Mr. Levain had said. And, on page, I think, 133 of Mr. Levain's deposition, he testified. And, again, construing the facts in a light most favorable to Mr. Levain, Mr. Whitridge confirmed. Yup, that was FMLA leave. It was noted on his time card. And, I believe that's when . . . which leads into the other issue, this alleged threat. I understand that Mr. Kreider used words like he was yelling and screaming inside of a shop that was extremely noisy. You had to sometimes wear a headset. You couldn't hear very well. My client held up this tardy notice and said, I'm going to get you on this. Now, reading the record coldly, like I'm charged to do, that doesn't evince a threat. He was threatening to actually file a complaint. Mr. Levain had a history of filing complaints when he felt his rights were violated. What's Mr. Levain's position about his demeanor when he did that? I mean, the words in and of themselves aren't exactly conciliatory or nice. They're not nice, but I think I'm going to get you on this. And I think he even explained that, what he meant, because Mr. Kreider apparently didn't hear him the first time he said it. He was away some ways. He turned around and asked him to repeat it. And Mr. Levain testified in his deposition, I explained, I'm going to get you on this, meaning I'm filing a Department of Labor complaint. He said explained? Because that's pretty contrary to what the others say, irate, angry, yelling. You know, explained is a nice little verb there. Is it borne out? I don't know. My point is that, same as Judge Gibbons, when you read the whole story, it sounds quite different. Whatever was happening, the volume caused the plant superintendent to emerge from his office. I think Mr. Kreider testified that they went to go get Mr. Muther to, I guess, assess the situation. Again, we pointed evidence of other witnesses where I would argue that other more direct threats of physical harm were made in this facility, and no disciplinary action was taken. I believe Mr. Levain had an unwarranted target on his back, primarily because he filed complaints against the very people that are now accusing him of making a threat. And I'm going to get you on this was meant exactly that. I want to file a complaint. And I want to point out, in Mr. Levain's deposition... Well, you might want to do that in rebuttal. I did not realize. I apologize. It just kind of works. Good morning, Your Honor. May it please the Court. Jeff Kopp on behalf of the appellee. Your Honor, appellee respectfully requests the trial court's order be affirmed. I know that you've read the briefs, and I'd like to just really address two points here. On the first point, the interference claim. As the Court is aware, under an interference theory, the primary issue is whether Tower failed to give Mr. Levain a substantive right under the Family Medical Leave Act, either perhaps not giving him 12 weeks of leave or perhaps not reinstating him upon at the end of the time that he comes back from leave. Here, that never happened. There was never a denial of FMLA leave. Well, but he's saying he got disciplined for an incident that should have been FMLA. Instead of giving him the leave, they disciplined him. Let me address, I'll address the July 29th date specifically, but what I meant was prior, when Mr. Levain first sought leave back in 2006 for his wife, and then 2012 and 13, that leave was always approved. He was approved for... I don't think anybody's really arguing about that stuff. And so the issue on July 29th, again, as Judge Gibbons pointed out, the issue of whether the FMLA, whether this was or was not FMLA or should have been coded as FMLA, never really saw resolution. As this Court said in the Edgar v. Jack case, if you wouldn't mind, the Court specifically said interference with FMLA rights does not constitute a violation if the employer has legitimate reason unrelated to the exercise of FMLA. Okay, here's the question I want to ask. Why isn't the unavailability of the rights supervisor, when he arrives a few minutes late that day in unusual circumstance, that excuses compliance with the company's usual notice procedures? Sure. And the company's normal, usual customary procedures in this case, as the trial court properly found, was that the labor contract required Mr. Levain to notify the HR department. I want to speak up just a little bit. Sure. Either notify the HR department prior to the shift start, or if that was not possible, within one hour after his shift started. Okay, so three minutes later. He never went to the HR department at all, ever. So the guy, I mean, this really seems like nitpicky stuff. I mean, the guy who is there writes FMLA on the card. Right. And so now we're going to, I mean, so he gets written up for that? The focus of the case and the termination and the ultimate resolution of the case had nothing to do whether or not Mr. Levain was granted FMLA on that particular occasion or not. They never got that far. They were trying to investigate, and if Mr. Levain rightly had a, if he had a position to say, hey, I did tell Mr. Wittridge, they would have reconsidered it, but they never got that far. So is it your position that this episode that does result in his termination, where he says I'm going to get you and et cetera, that that was meant to address the late arrival that day and kind of sort that out? Absolutely. Yes, sir. And that then gets truncated because what happened happened, and so we ought not to say it was interference because you were in the process of trying to figure it out. That's correct. Okay. I just want to understand your argument. But, you know, really the more easily determinative issues for you are causation and pretext. On the retaliation claim, yes, Your Honor. And so I want to address that second point on the retaliation piece. There's no real dispute about the material facts. Mr. Levain, when I deposed him, he said I hand papers in my hand, and I waved them, and I said I'm going to get you on this. That's his claim. The witnesses said I'm going to get you for this, so we're talking about one prepositional difference. But all the witnesses who testified said he was irate, he was yelling. They were apprehensive of fear that was based on Mr. Levain's conduct. Now, there's no evidence of direct retaliation. They try to point out that Ms. Rustall, the HR manager, made some admission that Mr. Levain was terminated for exercising FMLA. That's simply not the case. So then you're into the pretext analysis. And the three basis that the trial court found that there was no basis in fact for believing that there was pretext. Mr. Levain argues that, first, there's a basis in fact for believing that the threat Let me back up. There is no basis for pretext. First, there's not a basis in fact for believing that Mr. Levain did not threaten Crider. Based on Mr. Levain's testimony and the witness testimony, his own testimony, it's clear that his conduct was what it was on that morning. In the brief, Mr. Levain argues that he never acted like this before, and he wants to create some pretext to say that he had been a model employee before, which was not the case. Mr. Levain had been written up prior to him taking FMLA leave back in 2006, and the record reflects a lot of discipline throughout the years from the time he started with the company up until the time he was terminated. But more importantly, there was a document, one of the documents that I submitted, it's document 18, page 24, that is a counseling from a different time when Mr. Levain also engaged in the same kind of behavior, getting in someone's face when he didn't believe he was being properly handled the right way. So number one, there is a basis in fact for believing that he threatened Crider. Two, the threat was sufficient to warrant termination. Here, you know, the plaintiff comes forth just now and argues, or the appellant argues, that other people had not been terminated for making similar threats. First off, that's simply not the fact in the record. Mr. Muther testified in his deposition that others had been terminated for threats, but as this court is aware from the Toledo Hospital v. Mitchell case, when you're looking at comparators, you know, he hasn't presented any evidence that there are any similarly situated employees that were treated dissimilarly because they hadn't taken FMLA leave. And then the final point on the pretext is that the plaintiff, the pretext claim fails because the threat was sufficient to warrant termination. Here, you know, when you have somebody making a threat, that's serious misconduct. An employer has an honest belief that somebody could come back and be violent, and they have to deal with that. And that's why they have policies that are intended to prevent employee conduct like that. And that's what happened here. The only subjective belief by a co-worker that he put in that Mr. Levine was subjected to unfair treatment is not based on any admissible evidence that's in the record to show that he was treated any differently or let alone because he wanted to take FMLA leave. So for those reasons, Your Honor, I feel that Judge Ludington issued the summary judgment order should be affirmed, and he was right on his analysis on the retaliation piece of it. Thank you. Subject to any questions. Thank you, Your Honor. If I may, Mr. Davis, there's one question I want to ask you. My understanding is that really the only evidence you have of pretext here is the temporal proximity between Mr. Levine's attempt to invoke the FMLA and his termination. Is that correct? That's part of it. It's my position as well, Your Honor, that the words I'll get you on this was not a threat, not an actionable threat that would warrant a termination under the rules. Well, I mean, okay, the company's policy is pretty broad. It doesn't say you have to physically threaten anyone or beat them up. It says you have to treat everyone with dignity and respect. That's true. I mean, is that really an argument that you're making here that it's, on this record, it would be pretextual for them to have concluded that he did not behave in that manner? Yes, and the reason why I want to make that point is that under the culture of this shop, if I can call it that, no one speaks with perfect language. No one speaks dignified all the time. There was evidence in the record that there's other types of alleged shenanigans and threats and so on and so forth. But in this case, my client stated he believed his rights were violated. He said, I'm going to get you on this meeting. I'm going to file a complaint, and I think it's wrong, and I think this is where the district court erred in saying, well, we're now going to return your statement that I'm going to file a complaint, and we're going to characterize it now as a threat and shoehorn or put this into the category of an actionable termination reason. And that's why I think let a jury decide whether this was truly pretextual or not. And I just want to point out one of the exhibits that was introduced at Mr. Levain's deposition, exhibit number 10, this was an e-mail written by Christine Covino, who was the designated human resources person to interview Mr. Levain. And even on July 31st at 3.53, she writes an e-mail to Gretchen Rostel and Jeff Muther and some others that said, John said he told Al, meaning Al Whitridge, that he was going to get the Department of Labor involved because this is a violation of FMLA. That was his intent. That was what he was saying. That was what he meant. I do believe that the record creates enough of a fat question. The fact that we differ as to whether this is a threat or not goes to the jury. And I cited in my reply brief the case of Bowden v. Anaconda Minerals, which was another employment discharge case involving an alleged threat. And admittedly, this is from the Southern District of Ohio, 757 FSUP 848. I cited on page 14 of my reply brief, the credibility and factual dispute surrounding the scope and meaning of the conversation between plaintiff and Carol Sagan remains a genuine issue for trial and cannot be resolved by summary judgment. And this pertains to an alleged personal threat made by plaintiff to others within the company as a sole basis for this action. And I think the record in this case presents enough differing accounts and testimony that survives summary judgment that this goes to the jury. The standards are low for notice. I do believe that it's just bad policy for an employee to say, my rights were violated and I'm going to get you on this. Granted, it wasn't the best way to explain it, but he meant I'm firing a complaint and then they fire him because he said those words. I think that's wrong and that's interference and retaliation. Thank you. Thank you. We appreciate the argument both of you have given and we'll consider the case carefully. Thank you.